# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| MICHAEL E. MYLES, | |
| Plaintiff, | Case No. 21-CV-1019-LTS-KEM |
| vs. | |
| KILOLO KIJAKAZI,<br>Commissioner of Social Security, | **REPORT AND<br>RECOMMENDATION** |
| Defendant. | |

Plaintiff Michael E. Myles, proceeding pro se, seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f). Myles argues that substantial evidence does not support the Commissioner's residual functional capacity (RFC) determination, particularly with regard to his ability to work around other people. I recommend **affirming** the Commissioner's decision.

## I.  BACKGROUND

Myles, born in 1979, has never sustained full-time employment over a long period of time. AR 81-90, 306, 491-92.[1] He has worked as a cashier at multiple stores, at restaurants and fast-food establishments, in factories, and in other jobs performing manual labor. *Id.* He testified that invariably, after a month or two, something happens that makes him want to resort to violence or otherwise quit, and he leaves so that he does not become assaultive. AR 81-90, 107. He gave specific examples: a manager walked behind him too closely while he was performing factory work, which scared him after

---

[1] AR refers to the administrative record below, filed at Docs. 12-2 to 12-8.

spending years in prison, and he left rather than beat him up; he "exploded" at a manager who had made a mistake at a fast food restaurant and walked off the job; coworkers' chosen topics of conversation at a restaurant distressed him, and he quit when he found himself plotting ways to find them after work and hurt them; he became overwhelmed working in a busy restaurant and believed coworkers were mad that he had gotten a raise, and he left during his shift and drove to Chicago, and the manager would not let him return to work the next day; he became overwhelmed working as a cashier when ten customers were in line, and he quit rather than fight demanding customers; and during a manual-labor job, he thought his manager was out to get him when he switched him from one kind of work to another, and his manager let him go home when he said he was scared. AR 82, 86-87, 493 He reported one job that he had worked on and off for a longer period of time: a factory job in Illinois through a temp agency where the other employees did not speak English and he did not have to talk to them, and the job had flexible hours so he could leave town and come back as he wished. AR 493.

Over the years, Myles has also spent time in jail and prison. He reported being in prison from 2001-2002, 2004-2006, 2006-2008 (with a six-month break in between the previous stint ending in 2006), 2010, and 2012-2013. AR 494. Charges included possessing marijuana with the intent to distribute, driving while intoxicated, domestic assault, unlawful firearm possession, and escape. AR 407-08. Prison records from 2013 show that Myles was diagnosed with alcohol dependence, cannabis abuse, antisocial personality disorder, and bipolar disorder, and that he reported using PCP[2] from ages 16 to 29 (1995-2010). During a 2013 intake mental-health screening, he denied suffering mental-health problems or taking medications, although he did acknowledge anxiety in crowds and rage blackouts where he might lose his temper and hurt someone. AR 408, 462, 472. Prison records also reflect that in May 2013, Myles requested to be placed on

---

[2] Phencyclidine.

2

Case 2:21-cv-01019-LTS-KEM  Document 26  Filed 08/10/22  Page 2 of 15

the mental-health unit because he wanted to be in in a single cell away from his "young punk" cellmate, noting he had problems with anger management and violence. AR 409. He declined medications and a visit from psychiatry. *Id.* The next day, he requested to be returned to his original cell. AR 445. He said he had been getting along with his cellmate and had been upset over a miscalculation of his good-time credits, which had since been fixed. *Id.* He explained that he needed time alone to wrap his head around the mistake, but now that it was solved, he was ready to return to his cell. *Id.* The record also contains a prison intake form from November 2017, which reflects a normal mental status examination (normal speech, cooperative, calm mood and affect, and normal orientation). AR 480. A sheriff's intake form from May 2018 reflects that Myles appeared intoxicated and smelled of alcohol and marijuana. AR 482. And a prison record from August 2018 notes that Myles would be placed in administrative segregation due to "mental-health issues." AR 489.

    Myles filed for SSI benefits on October 5, 2018, alleging disability based on anxiety, post-traumatic stress disorder (PTSD), and bipolar disorder (Myles had previously filed applications in November 2015 and August 2017, both of which were denied on initial review). AR 124-25. The Social Security Administration referred Myles to a psychological consultative examination with Jeannie Sims, PhD. AR 491-94. Myles met with Dr. Sims on December 7, 2018. *Id.* He told Dr. Sims he was disabled because it was "complicated" for him to work with people, and he has now worked at enough places in the area (Dubuque, Iowa) that employers know he has a bad temper and refuse to hire him. AR 491. He stated that since moving to Iowa from Chicago, he had worked to adjust his temper and had not been violent, although he still got angry sometimes. *Id.* Myles brought index cards to the appointment with his history and symptoms, and he told Dr. Sims that he was "no longer going to hide his mental[-]health symptoms" and that he has suffered from hallucinations since he was nine years old, including seeing "little black figures," mistaking trash on the road for a deer, and hearing

people that were not there while he was in prison. *Id*. He reported irregular sleep habits, noting that he might be awake for seventy hours straight (not on drugs), or he might wake up at 3:00 a.m. and clean the house. AR 493-94. When asked about substance use, he said that PCP made him feel normal and that he felt crazy without it, and that he overcame his addiction when he moved to Dubuque because PCP was not readily available. AR 494. Dr. Sims noted that he "shared little about how he overcame his PCP addiction" and that PCP abuse is known to aggravate hostility and cause paranoia as a long-term side effect. *Id*. Dr. Sims noted she did not observe psychotic thoughts or behaviors or an abnormal mood, and she found the information insufficient to diagnose a mental-health disorder. *Id*. She noted Myles came across as a "sincere man distressed about walking off the job to avoid trouble." *Id*. Dr. Sims found Myles did not suffer functional limitations related to instructions, procedures, locations, memory, concentration, or pace, but that he would need preparation for any change in supervisors or coworkers to reduce discomfort. *Id*. She found his ability to work with the general public was unclear. *Id*.

Shortly thereafter, in January 2019, the Social Security Administration denied Myles's request for SSI benefits. AR 127. The Social Security Administration noted no treatment for Myles's alleged psychological problems, and he did not complete function reports. AR 127. The Social Security Administration found Myles had not established that he suffered from any mental-health impairments. *Id*.

Myles moved for reconsideration, reporting in February 2019 that his depression had worsened such that he cried out of nowhere and could not be alone or he panicked after a few hours. AR 281. In April 2019, Myles and his girlfriend (and mother of his child) completed function reports. AR 288-94, 300-07. Myles's girlfriend noted he had difficulty maintaining employment due to anxiety and becoming upset with others. AR 288. She noted he could perform activities of daily living such as personal care, preparing microwave meals or sandwiches, shopping, and doing laundry and dishes. AR 290-91. She said Myles gets angry a lot and thinks the police are out to get him, people are

bugged, and he is being watched. AR 293. She also noted issues with paying attention, following instructions, and handling stress and changes in routine. AR 293-94. In the function report he completed, Myles noted that he had stopped doing chores like he used to (although he still reported shopping, preparing simple meals, and washing clothes and dishes). AR 301-04. Myles also reported newfound difficulties handling personal hygiene. AR 301. He said he sees and hears things that are not there. *Id.* He noted issues getting along with others, as people made him feel violent and like fighting sometimes. AR 305. He also indicated difficulties paying attention and following instructions. *Id.*

In July 2019, Myles underwent a psychological assessment to establish care at Hillcrest Family Services. AR 496-505. The mental health counselor observed normal appearance, behavior, mood, affect, memory, and thought processes, but noted Myles had "rapid/pressured" speech, poor insight, fair judgment, dramatic attitude, and thought content reflecting paranoid ideation (Myles reported not eating sometimes because he was afraid someone poisoned the food, and he also said he often thought about people killing him). AR 504-05. The counselor also noted Myles reported past auditory hallucinations and current visual hallucinations—seeing dark figures and "events before they happen in real life." *Id.* Myles declined medications. AR 99.

Also in July 2019, Myles attended a second psychological consultative examination on behalf of the Social Security Administration with psychologist Carroll Roland, PhD. AR 511-15. Myles told Dr. Roland he could not obtain work because of his attitude, saying he wanted to beat people up if they were a jerk. AR 511. He reported being quick to anger and having a history of assaulting others. AR 513. Myles said he last used PCP in 2018 and that he would still use except that PCP was not readily available in Dubuque. AR 512. He reported using marijuana whenever he could. *Id.* Dr. Roland documented Myles was well groomed and cooperative, with normal attention, concentration, eye contact, memory, speech, and thought processes. AR 514. Dr.

Roland noted Myles's thought content was notable for hallucinations and paranoia beginning at age 16, concurrent with drug and alcohol use, as well as misinterpreting others' statements and wanting to fight. *Id.* Myles's responses to a depression screening indicated severe depression, which Dr. Roland noted was "incongruent with [his] clinical presentation." *Id*. Dr. Roland diagnosed Myles with paranoid schizophrenia; antisocial personality disorder; and alcohol, hallucinogen, and cannabis dependence. AR 515. Dr. Roland concluded test results demonstrated Myles could remember multi-step instructions at work. AR 514. Dr. Roland opined Myles could not work in a job requiring frequent interaction with coworkers or the public due to his high risk of becoming verbally or physically aggressive, and he noted Myles had the best chance of success working in a job by himself. AR 514-15. Dr. Roland noted his report was largely based on information provided by Myles, so the accuracy of the report largely hinged on Myles's reliability as a historian. AR 511, 515. Dr. Roland concluded Myles was a questionably reliable informant and suggested the Social Security Administration review other records for corroboration. AR 515.

In early August 2019, the Social Security Administration denied Myles's SSI application on reconsideration. AR 129-45. The Social Security Administration found Myles suffered from medically determinable mental-health impairments but ultimately concluded Myles was not so limited that he could not work. *Id.*

The record does not reflect that Myles obtained any treatment in the latter half of 2019. In early January 2020, Myles was arrested on warrants while staying with his girlfriend in Wisconsin, and the sheriff's deputy brought him to the hospital for medical clearance when he refused to answer questions at the jail. AR 528. The hospital record reflects that Myles was initially belligerent and angry, but he later calmed down when talking to the provider. AR 528-29. Drug testing was positive for THC but negative for PCP and other drugs. AR 526. Myles reported a history of schizophrenia and bipolar disorder and stated he had not taken his medications in a while. AR 529. He said he

was having a mental breakdown and really needed his medications. *Id*. Myles reported hearing voices telling him to do bad things to people, and he also expressed concern that jailers would kill him and make it look like a suicide (he wanted this belief documented in his chart as a safety precaution). AR 533. On objective examination, the provider noted agitation and aggression, anxious mood, and angry affect; normal speech, cognition, and memory; insight into his illness (as he requested medications); and impulsivity and homicidal ideation. AR 530. The hospital provider believed Myles should be hospitalized, but she cleared Myles for release to the jail after speaking with a social worker who disagreed. AR 533-34. Myles was prescribed Haldol (haloperidol), an antipsychotic. AR 94, 96, 540. In updating the Social Security Administration on recent medical treatment, Myles noted he was hospitalized after an anxiety attack and mental breakdown. AR 349. He stated the Haldol is "horrible but helps?" *Id*.

In early March 2020, Myles returned to Hillcrest Family Services for therapy with Miranda Kieler, LMSW. AR 543. Therapist Kieler noted Myles's thought content appeared devoid of psychosis, even though he reported struggling with hallucinations and delusions the last few weeks. *Id*. She observed depressed mood (but he laughed and smiled often); soft speech; fair attention and concentration; coherent thought process; and intact insight and memory. *Id*.

In mid-March 2020, Myles met with Hillcrest psychiatrist Mark Mittauer, MD, for the first time. AR 539. Myles reported suffering from depression since age 2, and he also reported suffering from manic episodes lasting up to three years at a time with rapid thoughts, increased energy, and less need for sleep. *Id*. He noted he worried a lot and suffered panic attacks. AR 540. He said for his entire life, he heard voices telling him who to hang out with and who will die next, and he would see people who were not really there out of the corner of his eye. AR 539. He noted he sometimes felt he was being followed. *Id*. Myles reported that his symptoms of depression, mania, anxiety, paranoia, and hallucinations resolved three weeks ago. *Id*. When asked why, Myles said

7

that nothing is real and that he started having this feeling three weeks ago to stop himself from going bananas. AR 539-40. Myles reported past suicidal ideation and multiple suicide attempts, but he became very angry when Dr. Mittauer questioned him about this history. AR 540-41. On objective examination, Dr. Mittauer noted loud, slow, and deliberate speech; logical thought processes with no psychosis; good insight; intact impulse control; serious, restricted, appropriate affect; good eye contact; and intact memory and concentration. AR 541. Dr. Mittauer also observed Myles was pleasant, cooperative, and neatly groomed and dressed. *Id.* Dr. Mittauer diagnosed Myles with schizoaffective disorder, bipolar type, and panic and anxiety disorder (among other things). AR 541-42. He prescribed Abilify (aripiprazole), an antipsychotic, and noted if Myles tolerated the oral dosage, he would prescribe an injectable at the next appointment. AR 542-43.

Myles's next appointment in the record was with Therapist Kieler in mid-April 2020. AR 538. Therapist Kieler noted Myles showed insight into anger-triggering events and ways to cope. *Id.* On objective examination, she found Myles was talkative and engaged and had anxious mood, good insight, intact impulse control, and fair attention and concentration. *Id.* She noted thought content showing some paranoid ideation, but Myles could identify that ideation, as well as identifying coping mechanisms. *Id.*

On May 21, 2020, the Social Security administrative law judge (ALJ) held a hearing by telephone with Myles and a vocational expert (VE) testifying. AR 16. Myles's testimony largely focused on his anger problems and difficulties working with people. AR 82-90, 107. When the ALJ asked why Myles could not work a job where he did not have to be around anybody else, such as a night janitor, Myles said that he had applied for such a job, but employers did not want to hire him because of his criminal history. AR 105. Myles said he was currently taking Abilify, which made him feel weird and like a zombie, but less violent (he sometimes did not have the energy to do chores because of the medication). AR 99, 102, 107-08. He testified that he self-treated

8

anxiety and hallucinations with alcohol and marijuana, and when that had stopped working, he agreed to psychiatric medications. AR 99, 103.

On July 21, 2020, Myles presented to the emergency room, stating two people put "black magic" in his head, and he wanted to find them and harm them. AR 558. He was admitted to the psychiatric ward for paranoia and thoughts of physical aggression. AR 552. Lab work was positive for THC and PCP. AR 559. During his inpatient stay, he refused to talk to providers or take medications. AR 558. Staff noted his paranoia improved during the course of his stay, but he made an effort to demonstrate his paranoia and hallucinations to staff (no staff member noted him internally preoccupied during his stay). AR 558-59. After three days, on July 24, Myles was discharged, as he refused all treatment, and multiple staff members felt very strongly he was malingering to stay in the hospital rather than return to the shelter. AR 559. During the course of his stay, Myles was verbally aggressive, and upon discharge, he had to be escorted out by security. *Id*. Upon discharge, he went to Hillcrest (Therapist Kieler (*see* AR 64)) and said he was suicidal, and Hillcrest staff brought him back to the emergency room. AR 547-49. Myles told emergency room providers that he would be suicidal or homicidal if released; they declined to admit him and found him malingering based on his contingent suicidality. AR 549. Providers also noted he would not benefit from admission as he refused all treatment. *Id*. When providers told Myles he would not be admitted and offered to transfer him to a different facility, he became extremely angry and physically and verbally aggressive, shouting in people's faces and swinging the doors of other patient's rooms. *Id*. When police arrived, he ran from the emergency room. *Id*.

Myles wrote to the Social Security Administration, requesting that it not obtain the records from his July 2020 hospitalization. AR 369-71. Myles said Abilify made him violent and suicidal, and he faulted the psychiatric ward providers for trying to prescribe him medications without contacting Dr. Mittauer (there is no evidence in the hospital records that Myles ever raised this concern). *Id*. Myles contended the hospital treated

9

him in an unprofessional manner, and for this reason, he said its records should not be admitted to the administrative record. *Id*.

On September 16, 2020, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[3] to determine whether Myles was entitled to SSI benefits. AR 16-29. The ALJ found Myles suffered from the following severe impairments: schizoaffective disorder, bipolar type; generalized anxiety disorder; antisocial personality disorder; and alcohol, PCP, and cannabis use disorders. AR 19. To aid in the evaluation whether Myles could work, the ALJ determined Myles had the following RFC[4]:

> [Myles] has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand, remember, and carry out simple instructions consistent with unskilled work; can perform only simple decision-making related to basic work functions; and can tolerate only minor, infrequent changes within the workplace and can tolerate no more than occasional interaction with co-workers or supervisors but in small numbers and for short periods with no tandem tasks and work is done relatively interpedently with minimal, superficial interaction with the general public.

AR 22. The ALJ found that Myles had no past relevant work but relied on VE testimony to find that a significant number of jobs existed in the national economy that Myles could

---

[3] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 416.920**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[4] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. § 416.945(a)(1)**).

perform, such as lab equipment cleaner, clerical folding machine operator, and table worker. AR 28. Accordingly, the ALJ concluded that Myles was not disabled. AR 29.

Myles appealed. The Appeals Council denied Myles's request for review on August 26, 2021 (AR 1-4), making the ALJ's decision the final decision of the Commissioner.[5] The Appeals Council declined to exhibit additional treatment records from Hillcrest, finding that they would not change the outcome of the decision. AR 2. The new records consisted of three therapy appointments with Therapist Kieler in summer 2020, prior to the ALJ's decision (and thus during the relevant time period); an August 2020 appointment with Dr. Mittauer prior to the ALJ's decision; and four therapy appointments and one medication-management appointment spanning fall 2020 to January 2021, after the ALJ issued her decision. AR 41-65.

Myles filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Doc. 1).[6] The parties briefed the issues (Docs. 1, 14-16, 19-20) and the Honorable Leonard T. Strand, Chief District Judge for the United States District Court for the Northern District of Iowa, referred this case to me for a report and recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole."[7] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[8] The court "do[es] not reweigh the evidence or review the factual record de novo."[9] If, after

---

[5] *See* **20 C.F.R. § 416.1481**.

[6] *See* **20 C.F.R. § 422.210(c)**.

[7] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[8] *Kirby*, 500 F.3d at 707.

[9] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

11

reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[10]

Myles argues that the ALJ erred in finding him not disabled, as his temper prevents him from maintaining employment. Docs. 14, 15, 20. Myles suggests that because he has been diagnosed with multiple mental impairments, the ALJ should have found him disabled. But simply because a person suffers from a mental-health impairment does not mean that they are disabled.[11] The ALJ must determine a person's functional limitations as a result of any medically determinable impairment (as part of the RFC), and the claimant is disabled only if he is so functionally limited that no jobs (or an insignificant number of jobs) exist that the claimant could perform.

Myles also argues that his work history shows that he has never been able to work for long periods and is thus disabled. But the ALJ could instead conclude that the Myles's "poor employment history suggested a lack of motivation to work" and that Myles's unemployment was not the result of his medically determinable impairments.[12]

Myles suggests that the ALJ ignored treatment records from Dr. Mittauer and Therapist Kieler. The ALJ discussed the Hillcrest treatment notes in the record at the time the ALJ issued her decision. *See* AR 23-24 (discussing July 2019 initial evaluation at Hillcrest, March 2020 appointments with Dr. Mittauer and Therapist Kieler, and April 2020 appointment with Therapist Kieler). The ALJ noted relatively normal mental status

---

[10] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

[11] Myles's cited case, *Simon v. Commissioner, Social Security Administration*, 7 F.4th 1094 (11th Cir. 2021), is distinguishable for this reason. In that case, the treating psychiatric provider opined that the claimant's impairments "imposed significant limitations on [the claimant's] mental and social functioning." *Id.* at 1106. Here, Dr. Mittauer and Therapist Kieler recognized that Myles suffered from mental impairments, but they did not offer any opinion as to his resulting functional limitations, unlike the providers in *Simon* (and the ALJ included Dr. Sims's and Dr. Roland's opined limitations in the RFC determination).

[12] ***Julin v. Colvin***, 826 F.3d 1082, 1087 (8th Cir. 2016).

examinations at those appointments, as well as the overall limited nature of Myles's treatment. *Id*. The ALJ did not discuss treatment notes with Dr. Mittauer and Therapist Kieler from summer 2020 that were not in the record at the time the ALJ issued her decision, but these records similarly show relatively normal mental status examinations (except for paranoid thought content and disorganized thought processes).

Myles did not report suicidal ideation or hallucinations until after his disability claim was first denied, and multiple treatment records reflect medical providers thought he was malingering, or at least, they observed no evidence that Myles was responding to internal stimuli. As Myles now argues, his primary barrier to employment appears to be his anger issues. The ALJ considered this by limiting Myles to work performed relatively independently, in which he would only have to occasionally interact with a small number of coworkers or supervisors for short periods, and that would require only minimal and superficial interactions with the general public. AR 22. Substantial evidence supports this RFC determination.

Myles notes that he has applied for solitary jobs, but employers refuse to hire him because of his background and criminal history. But under the regulations, when determining whether jobs exist that the claimant could perform, the Social Security Administration does not consider the claimant's "inability to get work," "[t]he hiring practices of employers," or whether the claimant "would not actually be hired to do work [the claimant] could otherwise do."[13] Thus, courts have held irrelevant a claimant's "past criminal history and the effect that may have on potential employers['] willingness to hire him."[14]

---

[13] **20 C.F.R. § 416.966(c)**.

[14] ***Hentschel v. Berryhill***, No. 17-cv-006-LM, 2018 WL 839803, at *9 (D.N.H. Jan. 5, 2018) (collecting cases), *report and recommendation adopted*, 2018 WL 836362 (Feb. 9, 2018); ***Singletary v. Astrue***, No. 11-CV-6055, 2012 WL 3204071, at *11 (W.D.N.Y. Aug. 3, 2012).

Myles also argues that the VE testimony supports that he is disabled. The ALJ asked the VE a series of hypotheticals about an individual sharing Myles's age, education, and past work. First, the ALJ asked the VE to assume:

> [T]he hypothetical individual is able to understand, remember, and carry out simple to moderately complex instructions consistent with semi-skilled work, but the person can tolerate occasional interaction with coworkers and supervisors but in small numbers and for short periods, no tandem tasks, and work is done relatively independently with minimal superficial interaction with the general public.

AR 112. The VE testified that such an individual could work as a cleaner of laboratory equipment, clerical folding machine operator, or table worker. AR 112-13. The ALJ then asked the VE to assume that the hypothetical person just described "had a further restriction" to being able "to understand, remember, and carry out simple instructions consistent with unskilled work[,] and the person can perform only simple decision-making related to basic work functions, and the person can tolerate only minor, infrequent changes within the workplace." AR 113. The VE testified that such a person would still be able to work at the jobs previously identified. AR 113-114. Finally, the ALJ asked about a hypothetical individual who would "occasionally become involved in a verbal and/or physical altercation with coworkers or supervisors due to an inability to control temper" or a hypothetical individual who would "occasionally decompensate as a result of [a] bad interaction" and have to "leave his or her workstation." AR 114. The VE testified that no jobs existed for such an individual. *Id.*

Myles argues that the ALJ misunderstood the VE's testimony, which supports that no jobs exist for him due to his temper. But the ALJ's RFC mirrored the second hypothetical to the VE, not the final hypotheticals. *See* AR 22. That is, the ALJ found that if Myles worked in a job that required limited interaction with other people, then he would not have instances of losing his temper where he got into fights with his coworkers or had to leave to avoid such fights. Substantial evidence supports the ALJ's RFC

14

determination, and the ALJ did not err in relying on the VE's testimony in finding a significant number of jobs existed in the national economy Myles could perform.[15]

### III. CONCLUSION

I recommend **affirming** the Commissioner's decision and entering judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[16] Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[17]

**DATED** August 10, 2022.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[15] "A hypothetical question posed to the [VE] is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true [by the ALJ]." *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)). Put another way, the hypothetical need not include "any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated." *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)).

[16] **Fed. R. Civ. P. 72**.

[17] *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).